IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


COLEMAN LOGISTICS, INC., and  )
CHRISTENBERRY TRUCKING AND
FARM, INC.,                    )

              Plaintiffs,      )

        v.                     )          No.  3:03-cv-677

BREED SAFETY RESTRAINT         )
SYSTEMS, INC., d/b/a BREED
TECHNOLOGIES,                  )

              Defendant.       )


## MEMORANDUM OPINION


In this diversity action, plaintiffs, Coleman Logistics, Inc., and

Christenberry Trucking and Farm, Inc. (sometimes collectively referred to as "CTF"),

seek $2,046,232 in compensatory damages, unspecified punitive and/or treble

damages, and pre-judgment interest against defendant Breed Safety Restraint

Systems, Inc., d/b/a Breed Technologies ("Breed"), arising out of a freight contract

executed by the parties on July 30, 2001 [*see* Doc. 1, Ex. A].  CTF's primary theories

of recovery are based on breach of contract, promissory fraud (fraud in the

inducement), and violations of the Tennessee Consumer Protection Act ("TCPA"),

Tennessee Code Annotated §§ 47-18-101, *et seq.*  Additionally, CTF claims that it is entitled to recover the value of certain trailers which were delivered into Breed's possession which have not been returned.[1]  Finally, CTF seeks damages related to the purchase of new trucks required to perform the terms of this contract.  Breed denies any and all liability to CTF.

This matter came before the court on July 10, 2006, for a bench trial.  After giving careful consideration to the testimony of the witnesses, the exhibits introduced at trial, the proposed findings of fact and conclusions of law [Docs. 21 and 22], the post-trial briefs [Docs. 29-32], and the applicable law, the court makes the following findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a).

*Findings of Fact*

1.      Plaintiff Coleman Logistics, Inc. (sometimes referred to as "Coleman"), a Tennessee corporation, is a trucking brokerage service.   Plaintiff Christenberry Trucking and Farm, Inc. (sometimes referred to as "Christenberry"), a Tennessee corporation, provides trucking services.  Defendant Breed, a Michigan

---

[1]In its complaint, CTF also sought a "daily demurrage" on its trailers which were allegedly in Breed's possession [*see* Doc. 1, Ex. 2, p.4];  however, CTF has apparently abandoned this claim as it was neither set forth in the pretrial order [Doc. 17] nor mentioned in its proposed findings of fact and conclusions of law [Doc. 22].

corporation, builds component parts for the automobile industry such as safety restraint systems and has production facilities in Tennessee in both Knoxville and Maryville.

2.      Clayton V. Christenberry, Jr. ("Clayton") owns Christenberry. His son, Gusty Christenberry ("Gusty"), is Operations Manager of Christenberry, and Charles Dewitt Ingram is the General Manager and handles most financial affairs.

3.      At the time of the relevant events, Cameron Faircloth ("Faircloth") was the Director of Production Control for Breed, and Gary R. Boyer ("Boyer") was its Transportation Manager in Knoxville. Boyer and Faircloth were CTF's primary contacts at Breed. Additionally, Stuart Boyd was the General Counsel for Breed.

4.      Clayton testified at trial that he has been in the trucking business since the 1960s. In the 1980s, Christenberry entered into a contract with AlliedSignal, Inc. ("AlliedSignal"), to haul raw products for seat belts to locations in Texas and Arizona, which products would then be delivered across the border into Mexico for assembly. Clayton described these deliveries as "time-sensitive," which meant that freight haulers, such as Christenberry, had to deliver the needed parts to the assembly line "just in time" for the assembly line to receive them and

assemble them, thereby avoiding the manufacturing expense of warehousing those parts. Clayton testified further that the relationship between Christenberry and AlliedSignal began with Christenberry delivering a few truck loads for AlliedSignal, but it eventually evolved into one in which Christenberry carried all of the parts for AlliedSignal. Breed eventually bought AlliedSignal in the late 1990s. A copy of the contract for transportation services between Christenberry and Breed's predecessor, AlliedSignal, dated May 1, 1996, was marked for identification as Trial Exhibit 13.[2]

5.      For several years before the contract at issue, CTF provided transportation services for Breed's Knoxville operation. CTF made runs from the Knoxville area to various sites along the Mexican border. CTF's trailers loaded with Breed's parts were detached from CTF's trucks and delivered to Breed to then be picked up by Breed's Mexican trucking companies for transit into Mexico. There, the parts would be assembled for transit to various American automobile manufacturers in the Detroit area. CTF now claims that Breed lost some of these trailers [*see* Trial

---

[2]Breed objected to the introduction of Ex. 13 on grounds of relevancy, and the court took this objection under advisement. Breed points out that Ex. 13 is a contract between Christenberry and AlliedSignal - not Breed. Thus, according to Breed, this contract is not relevant because it has nothing to do with the contract in dispute between the parties in this case. *See* Fed. R. Civ. P. 401. Clayton, however, testified that this contract (Ex. 13) was the contract actually used by these parties when Breed took over the operation from AlliedSignal. The court has no recollection of any witness testifying contrary to Clayton's testimony on this issue. The court finds that Clayton's testimony on this issue is credible and Breed's objection is hereby OVERRULED and Ex. 13 is ADMITTED into evidence. Interestingly, Ex. 13 specifically provides that it is a "non-exclusive" contract between the parties.

Exhibit 18].  At trial, Clayton testified that Breed lost eight of CTF's trailers, the average value of each being around $12,000.  Breed points out, for reasons which will be discussed very shortly in more detail, that all but three of these trailers were reported missing before November 22, 2000 [*see id.*].  And, on the morning of trial, CTF indicated that only one of those three was still unaccounted for, *i.e.*, the very last one on Ex. 18 (assigned a value of $16,000).

6.    On September 20, 1999, Breed filed its voluntary petition for bankruptcy pursuant to 11 U.S.C. § 101, *et seq.*, with the United States Bankruptcy Court for the District of Delaware [*see* Trial Exhibit 11, Ex. 1].  Soon afterwards, several of Breed's suppliers demanded deposits against future invoices as a condition of continuing to do business with Breed.  Breed paid those deposits to several vendors including Airborne Express, American Freightways, Emory Worldwide, Federal Express, L&D Transportation, and Pro Trans.

7.    It is undisputed that Breed made a $300,000 payment to CTF on or about September 21, 1999 [*see* Trial Exhibit 14].  According to Boyer, this amount, just as with the other suppliers, was a deposit which would be paid back at sometime in the future.  However, according to Clayton, this amount "was never a

deposit nor intended to be a deposit." [*See* Doc. 10, attachment].[3] Rather, this $300,000 amount was "a premium for continuing to do business with a Chapter 11 Debtor in Possession which had filed for bankruptcy owing the company [CTF] in excess of $600,000." [*Id.*].[4] Clayton further testified that the "$300,000 we demanded of BREED after the filing of the bankruptcy was an amount we required in order to keep servicing BREED's time sensitive transportation requirements which they [sic] needed in order to continue to operate." [*Id.*]. Regarding that payment, Clayton sent the following letter to Boyer on September 22, 1999:

> Gary,
>
> Per your instructions the following are the items requested. Any monies received via wire transfer or other means will be applied only to post petitioned invoices after 9/21/99. All pre-petitioned invoices will remain as they are, any advances will not be applied towards these invoices.
>
> We are requesting $300,000. In advance for any and all freight that is the responsibility of BREED Technologies after 9/21/99 and will not be applied to any pre-petitioned invoices.
>
> * * *

[*See* Trial Exhibit 2.][5]

---

[3]This testimony was set forth in Clayton's affidavit filed on October 16, 2004 [*see id.*], which was consistent with his trial testimony.

[4]Clayton also testified that he "never knew nor was [he] told by Breed that they [sic] had paid any amounts to anyone else nor what agreements they [sic] may have had with any other vendor after it filed for bankruptcy." [*Id.*].

[5]This letter was also signed by Dewitt Ingram and Ted Neff (whose position with CTF does not appear to be set forth in this record).

8. On November 22, 2000, the Bankruptcy Court entered an order confirming Breed's Third Amended Plan of Reorganization [*see* Doc. 19-3]. Among other things, that Confirmation Order discharged Breed and its consolidated subsidiaries " ... from any claim or any 'debt' ... or from any conduct of the Debtors prior to the Confirmation Date ... ." [*See id.*, p.11].  Moreover, that order provided that " ... all persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding ... seeking to hold ... Reorganized Breed ... liable for any claim, obligation, right, interest, debt or liability that has been discharged or released pursuant to Section[] 11.1 ... of the Plan." [*Id.*, at p.17].  Finally, § 11.1 of the Plan also provides for the discharge of Breed and its consolidated subsidiaries " ... upon ... the Effective Date ... from any Claim ... that arose ... from any conduct of the Debtors prior to the Confirmation Date ... ." [*See* Doc. 19-4, p.37].

9. The Effective Date of the Plan was December 26, 2000.  On that date, Breed and its consolidated subsidiaries were discharged from all claims that arose prior to the Plan's Confirmation Date, *i.e.*, before November 22, 2000.  In this action, CTF seeks damages for the loss of trailers whose last known date of movement was - with three possible exceptions - before November 22, 2000.

10.     After emerging from bankruptcy on December 26, 2000, Breed asked vendors - including CTF - to return its deposits.  Some vendors paid back the entire amount in one check and others returned the funds over time.  For example, according to the spread sheet kept by Boyer, Airborne Express returned a $30,000 deposit by making two $15,000 payments;  American Freightways returned a $10,000 deposit in one payment;  and L. & D. Transportation made multiple payments, ranging from $50,000 to $10,000, until it had returned the entire $150,000 deposit [*see* Trial Exhibit 3].  CTF did not, however, return any portion of the $300,000 to Breed at this time because, as previously noted, Clayton believed that the $300,000 was not a security deposit;  thus, according to Clayton, CTF did not owe that money to Breed.

11.     At about the same time Breed was demanding from CTF its $300,000 "deposit," CTF in turn was demanding a rate increase since, as previously noted, the parties were still operating under the 1996 freight contract between Christenberry and AlliedSignal, including the rates set forth therein.  Consequently, in the spring of 2001, Breed and CTF began negotiations for a contract which would establish a rate schedule, fuel surcharges, and other aspects of their business relationship.  More particularly, Clayton testified that he initially sought a 6% rate increase for CTF;  however, he received a 3% rate increase.  Additionally, Clayton

sought a five-year contract; however, he received a three-year contract (according to Clayton, Breed wanted a one-year contract).

12. During negotiations, Clayton suggested to Boyer and Faircloth that if he were to receive enough of an increase over a three-year period, based upon monthly billings of $400,000 to $460,000, then he could discount the freight rates in an amount of $300,000 to enable Boyer and Faircloth to satisfy their superiors. Moreover, during these discussions, the initial idea, according to Clayton, was to obtain the discount over the entire three-year period. Nevertheless, Faircloth demanded that he receive the discount in a shorter period of time. In fact, according to Clayton, Faircloth, using an easel, made a presentation showing Clayton how CTF could make up its money "on the back end" of the three-year contract.[6] Clayton testified that all of these negotiations were predicated on a factor of 4.6% of the anticipated regular weekly billings of around $100,000 so that Breed would receive a discount of $20,000 a month. Clayton repeatedly emphasized during his testimony that he did not believe that CTF owed $300,000, but that this precise amount could be discounted if the 3% increase were factored into the calculus.

13. The negotiations for the written freight contract itself spanned a period of several days. According to Clayton, David L. Buuck, one of CTF's

---

[6]Faircloth denied making any such representation, however.

attorneys of record, prepared the first draft of this contract; Mr. Buuck also prepared the final draft after Boyer submitted the draft to Breed's legal department for review. That contract, which is at the heart of this litigation, provides, among other things, that "Coleman[] agrees to haul freight for BREED and BREED agrees to pay Coleman for said services provided hereunder." [*See* Trial Exhibit 1, p.1]. The rates are then set forth in Addendum A to the contract. The term of the contract is three years, and it also provides that "[t]ermination ... for cause requires 60 days written notice by either party." [*See id.*]. The contract also provides that, "This agreement is contingent on ... Coleman maintain[ing] competitive pricing, quality and service." [*Id.* at pp.1-2]. It must be noted that the main body of this contract was executed only by Coleman, as the broker for Christenberry, and by Breed.

14.     Addendum D to the contract provides that Christenberry will "discount" Breed $300,000 via monthly payments, specifically setting forth the following:

. . .

2.     [Christenberry] will make monthly discount payments to BREED in an amount of $20,000 per month as long as the average monthly trade payments from BREED to Coleman Logistics are between $380,000 and $460,000.

3.     For example, [i]f any consecutive three month average billing drops below $380,000.00, subsequent

month's discount will change to $18,000. If any consecutive three month average billing is above $460,000, subsequent month's discount amount will change to $23,000. Such payments shall be made by check on the first day of each month beginning 8/1/2001 and shall continue until the $300,000 is remitted to BREED. This is based upon a percentage of 4.6% trade payments from BREED.[7]

[*See* Trial Exhibit 1]. Interestingly, Addendum D was executed only by Clayton, on behalf of Christenberry, and by Breed. Coleman did, however, guarantee the payment of this $300,000 discount to Breed in the main body of the contract.

15.    The freight contract does not provide that Breed will purchase any specified amount of transportation services from CTF. Nor does this freight contract indicate that it is an "exclusive" contract between these parties for freight hauling services or any requirement that CTF will haul all of the freight in any particular lanes. Nevertheless, Clayton testified that he believed that this was an exclusive contract for a three year period and that he "trusted" Breed on this issue. However, when questioned by the court on this issue of exclusivity, Clayton conceded that there is no such language in the contract and that he "let that get by" him. Clayton also admitted that he knew that Breed had used other carriers at times.

---

[7]Under Addendum D, according to CTF, if "$300,000 ... is divided by 4.6% and divided by the 15 months agreed to pay off the discount, the monthly amount contemplated by the parties for the term of the contract was $434,782 per month in billings." [*See* Doc. 10, p.5, n.2].

16.     Boyer testified at trial that he made no promise to CTF that this was some sort of "exclusive" contract during their negotiations. Rather, this contract simply set forth the financial terms for the next three years. Boyer did testify, however, that he considered this contract an "exclusive" contract for Breed with respect to the lanes identified on Ex. A to the contract; yet, he also admitted that Breed must have used some other carrier for those lanes because Breed used CTF "99%" of the time with respect to those lanes. Faircloth testified too that Breed did not intend for this contract to be "exclusive." According to Faircloth, the only purpose of this contract was to cover rates for the three-year period.

17.     CTF contends that Breed was obligated to purchase between $380,000 and $460,000 of services per month. CTF's expert witness, Van T. Elkins, prepared a report in which he opined that CTF suffered lost profits of $794,534.14, based on a minimum monthly figure of $380,000.[8] Yet, the actual amounts spent by Breed for CTF's services for the twenty-five months of the contract averaged only $263,000 per month [see Trial Ex. 15]. In fact, in December 2001, Breed spent only $160,776.44 [see id.]. In other words, Breed spent less than 70% of the alleged minimum during this time. Yet, CTF never once objected during this same time frame that Breed was not spending enough. There is no mention in this record at

---

[8]Mr. Elkins also admitted on cross-examination that if the $380,000 monthly minimum calculation is in error, then his report has no alternate measure of calculated damages [see Doc. 33, p.18].

all of any letter, e-mail, or telephone call in which CTF objected to the amount Breed was paying to CTF. Nor does any witness on behalf of CTF so testify.

18.     There is also no mention in the written contract regarding the purchase of any new trucks by CTF to service this agreement. Clayton testified that Boyer knew that plaintiff had to buy ten new trucks to satisfy this contract. Clayton testified too that the price of each of these new trucks, which were Peterbilt sleepers, ranged from $96,000 to $110,000. Thus, Clayton is seeking a minimum judgment of $960,000 for the purchase of these ten new trucks. Nevertheless, Clayton admitted that he never sought approval from Breed before making this purchase. Both Boyer and Faircloth testified that they never did - nor would they - approve of any vendor's equipment purchase such as these trucks.

19.     During the next twenty months, CTF made payments to Breed in varying amounts which eventually resulted in the return of the $300,000 deposit to Breed as of March 26, 2003.[9]

---

[9]A $20,000 payment was made when the contract was executed in July 2001. Thereafter, the parties apparently began the term effective August 1, 2001, with discount payments made in arrears. Thus, the next discount payment was made on September 5, 2001, based upon freight hauled in August 2001.

20. On April 25, 2003, not long after the $300,000 had been paid back by CTF, a group of investors acquired Breed, eventually changing the name of the company to Key Safety Systems.[10] As part of its efforts to improve its financial performance following the purchase, Breed pursued a variety of cost reductions including those related to transportation.

21. In July 2003, Greg Bennett and Tony Ewing, two of Breed's new owners, met with Boyer and Faircloth in Knoxville and instructed them to reduce transportation costs by 10% to 15%. According to Clayton, Breed wanted CTF to provide two drivers per truck at the same rate it was paying under the freight contract for one driver. Additionally, Breed wanted CTF to purchase and provide Air Ride trailers and to extend payment terms from 15 days to 90 days. CTF refused to do so, insisting on payment under the terms of the contract.

22. On August 21, 2003, after consulting with legal counsel, Boyer sent a letter to CTF indicating that Breed would shift its freight business to other carriers in order "to improve overall cost and service." [*See* Trial Ex. 5]. CTF then filed this lawsuit on November 5, 2003, in the Circuit Court for Blount County, Tennessee, Equity Division [*see* Doc. 1, Ex. 2]. Breed timely removed the action to

---

[10]For simplicity, the defendant will continue to be referred to as "Breed" regardless of the time period involved.

this court on December 12, 2003, alleging diversity jurisdiction [Doc. 1]. *See* 28 U.S.C. § 1446(b).

## *Conclusions of Law*

*A.  Jurisdiction and Choice of Law Determination*

1.      Plaintiffs are both corporations incorporated under the laws of the State of Tennessee, and Breed is a corporation incorporated only under the laws of the State of Michigan, with its principal place of business in the State of Michigan.  Additionally, CTF seeks more than $2 million in compensatory damages, as well as punitive and/or treble damages and pre-judgment interest.  Therefore, this court has subject matter jurisdiction based on diversity of citizenship of the parties and the amount in controversy easily exceeding $75,000.  28 U.S.C. § 1332(a)(1).

2.      When a federal court's jurisdiction is based solely on diversity of citizenship, the federal court must apply state law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  Under the *Erie* doctrine, a federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941); *Tele-Save Merchandising Co. v. Consumers Distributing Co.*, 814 F.2d 1120, 1122 (6th Cir. 1987).

3.	In resolving contractual disputes in the absence of an enforceable choice of law provision, Tennessee adheres to the rule of *lex loci contractus*. *See Starr Printing Co., Inc. v. Air Jamaica*, 45 F.Supp.2d 625, 629 (W.D. Tenn. 1999) (applying Tennessee law). Therefore, when the dispute involves questions concerning the validity of a contract, the court applies the law of the state where the contract was made. *See Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973). In this case, there is no choice of law provision in the freight contract at issue; it is undisputed, however, that this contract was entered into in the State of Tennessee. Consequently, Tennessee law will be applied to the breach of contract issue.

4.	In resolving disputes sounding in tort, Tennessee has adopted the "most significant relationship" approach contained in the *Restatement (Second) of Conflict of Laws* (1971). *See Hattaway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992). If any promissory fraud occurred in this case, these acts or omissions occurred in the State of Tennessee. Hence, Tennessee has the "most significant relationship" to this dispute and its law on that tort issue will also be applied.

*B. Breach of Contract Claim*

5.　　　Under Tennessee law, the rights and obligations of contracting parties are governed by their written agreements.  *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).  The cardinal rule in the construction of contracts is to ascertain the intent of the parties.  *Bradson Mercantile, Inc. v. Crabtree*, 1 S.W.3d 648, 652 (Tenn. Ct. App. 1999) (citing *West v. Laminite Plastics Mfg. Co.*, 674 S.W.2d 310 (Tenn. Ct. App. 1984)).  Courts may determine the intention of the parties "by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the circumstances of the particular transaction giving rise to the question, and by the construction placed on the agreement by the parties in carrying out its terms."  *Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990).

6.　　　If the contract is plain and unambiguous, the meaning is a question of law, and the court must enforce the agreement according to its plain terms.  *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355 (1955);  *Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct. App. 1991).  The language used in a contract must be taken and understood in its plain, ordinary, and popular sense.  *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578 (Tenn. 1975).  If the language of a written instrument is unambiguous,

the court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat. Bank of Crossville*, 620 S.W.2d 526 (Tenn. Ct. App. 1981). The courts are also not "at liberty to relieve parties from their contractual obligations simply because these obligations later proved to be burdensome or unwise." *Hillsboro Plaza Enterprises*, 860 S.W.2d at 47 (citations omitted). Moreover, courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made. *Bradson Mercantile*, 1 S.W.3d at 652 (citing *McKee v. Continental Ins. Co.*, 191 Tenn. 413, 234 S.W.2d 830 (1951)).

       7.       Finally, under Tennessee law, ambiguous contract provisions are to be construed against the party responsible for the drafting. *See Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 425 S.W.2d 590, 592-93 (1968); *Burks v. Belz-Wilson Properties*, 958 S.W.2d 773, 777 (Tenn. Ct. App. 1997). However, whether contractual terms are ambiguous is also a question of law for the court. *Tennessee Consol. Coal Co. v. United Mine Workers of Am.*, 416 F.2d 1192, 1198 (6th Cir. 1969), *cert. denied*, 397 U.S. 964 (1970). The language of a contract is ambiguous if its meaning is susceptible to more than one reasonable interpretation. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

8.	To prevail on its breach of contract claim, CTF must prove, by a preponderance of the evidence, that Breed contractually agreed to use CTF's hauling and logistics services exclusively or, in the alternative, agreed to a minimum amount of billings per month for three years.  Unless CTF can prove exclusivity or some sort of minimum, Breed was free to utilize other haulers during the three-year term of this agreement.

9.	As previously noted, under Tennessee law, the rights and obligations of contracting parties are governed by their written agreements, in this case, by the written freight agreement.  *Hillsboro Plaza Enterprises*, 860 S.W.2d at 47.  Here, it is undisputed that the freight contract is devoid of any language obligating Breed to use CTF exclusively for its hauling needs.  The freight contract is also devoid of any language requiring Breed to provide CTF with any minimum amount of business per month.  Instead, the language in the contract simply discusses what happens *if* Breed does a certain amount of business with CTF.  The language in this contract regarding exclusivity and minimum amounts is unambiguous;  thus, the contract's meaning is a question of law and this court must enforce the agreement according to its plain terms.  *Richland Country Club, Inc.*, 832 S.W.2d at 557.  Pursuant to those plain terms, the court is now constrained to hold that this agreement is not an exclusive freight contract.  Therefore, CTF has failed to carry its burden of proof that Breed breached the contract.

10. In support of this conclusion, the court relies on Clayton's own testimony in which he acknowledges that he knew Breed used other carriers. Likewise, Boyer admitted that Breed used other carriers for the lanes set forth on Ex. A to the freight contract. Even more significantly, there is no evidence that CTF lodged even one complaint about the fact that Breed was using other carriers or was not spending enough with CTF, even though CTF now claims it was entitled to a $380,000 minimum monthly amount of business. The proof simply does not support CTF's breach of contract claim.

11. In reaching this conclusion, the court further acknowledges that it previously found that the language of this freight contract with respect to Breed's obligation was "ambiguous because it is susceptible to more than one reasonable interpretation." [*See* Doc. 15, p.12]. However, at that point in time, the court was required to view the evidence in the light most favorable to CTF and to draw all "justifiable inferences" in CTF's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Consequently, the court had no evidence before it as to the actual construction placed on the agreement by the parties in carrying out its terms. *See Penske Truck Leasing Co.*, 795 S.W.2d at 671. Furthermore, at that time, the court did not have a fully developed record; rather, the court only had before it Clayton's affidavit in which he did a masterful job of creating a genuine issue of material fact on this issue. Based on this incomplete record, the court was

concerned that the parties might be treating this agreement as an exclusive contract even though there was no language requiring the parties to do so. *See Penske Truck Leasing Co.*, 795 S.W.2d at 671. Consequently, the court was compelled to resolve this issue in favor of CTF, pending a full hearing on the merits when all witnesses could testify. Now that the court has heard from all necessary witnesses, the evidence indicates that the parties did not treat this contract as an exclusive one. The trial testimony of the witnesses irrevocably changes the landscape with respect to CTF's breach of contract claim.

12.     Additionally, in previously denying Breed's motion for summary judgment, this court was concerned with the fact that this was a three-year contract. Nevertheless, Boyer and Faircloth both testified that they understood this contract to be a three-year rate agreement. The court agrees with Breed that there is nothing unusual about a business committing to hold its prices steady for a defined period of time. Moreover, this provision, in light of a fully developed record, does not inherently imply that Breed is committing to use only CTF's services during that three-year period.

13.     Furthermore, in previously denying Breed's motion for summary judgment, this court was troubled that the requirement of a 60-day notice period for termination "for cause" created some sort of ambiguity. However, in view

of this fully developed record, the court concludes that Breed never terminated the contract "for cause" or for any other reason. Instead, Breed simply notified CTF that, due to CTF's unwillingness to meet competitive pricing, Breed would begin to use other carriers, an action that was specifically contemplated by the freight agreement, *i.e.*, the freight contract "is contingent on ... Coleman maintain[ing] competitive pricing ... ." [*See* Trial Exhibit 1, pp.1-2].

14.     Finally, when this court previously denied Breed's motion for summary judgment, this court was concerned about the fact that these parties operated under this freight agreement without dispute for approximately 20 months until, as the court termed it "suspiciously," the $300,000 had been paid back by CTF to Breed, thereby depriving CTF of the bulk of its anticipated profits under this contract [*see* Doc. 15, p.13]. Again, however, in view of a fully developed record, the court now concludes that this $300,000 amount was a deposit which CTF was obligated to repay to Breed. This conclusion is supported in part by the fact that all other vendors repaid a similar deposit to Breed. This conclusion is also supported by the fact that Coleman independently guaranteed the payment of this "obligation of Christenberry" in the body of the freight contract [*see* Trial Exhibit 1, p.2]. And Coleman guaranteed this repayment even if the contract had been terminated by the parties for some other reason. Consequently, this court no longer concludes that there was anything "suspicious" about this arrangement under these circumstances.

15.	Assuming, *arguendo*, that this freight contract could be construed as ambiguous with respect to this exclusivity provision, there is another significant reason why CTF cannot prevail on its breach of contract claim.  In Tennessee, the law is well settled that ambiguous contract provisions are to be construed against the party responsible for the drafting.  *See, e.g., Hanover Ins. Co.*, 425 S.W.2d at 592-93;  *Burks*, 958 S.W.2d at 777.  Here, the evidence indicates that CTF's counsel, David L. Buuck, prepared the first draft of this contract, as well as the final draft after Boyer submitted the draft to Breed's legal department for review.  Mr. Buuck could have easily inserted the word "exclusive" within this agreement if the parties had actually intended for this to be an exclusive contract.  However, that word was not employed in this contract and the contract, under Tennessee law, must be construed against CTF under these circumstances.  It is also particularly telling that the previous contract between Christenberry and AlliedSignal - a contract under which these parties operated for some time - stated that it was a "non-exclusive" contract between those parties.  Thus, these two parties had been operating under a "non-exclusive" contract without dispute for some time before executing the freight contract at issue.  And, as it turns out, the parties continued to operate under a non-exclusive agreement.

*C. Promissory Fraud (Fraud in the Inducement)*

16.        CTF next claims that Breed committed promissory fraud.  The Tennessee Court of Appeals set forth the elements of an action for this tort in *Stacks v. Saunders*, 812 S.W.2d 587 (Tenn. Ct. App. 1990), as follows:

> (1)        An intentional misrepresentation with regard to a material fact;
>
> (2)        Knowledge of the misrepresentation's falsity - that the representation was made "knowingly" or "without belief in its truth" or "recklessly" without regard to its truth or falsity;
>
> (3)        That the plaintiff reasonably relied on the misrepresentation and suffered damages;  and
>
> (4)        That the misrepresentation relates to an existing or past fact, or if the claim is based on promissory fraud, then the misrepresentation must embody a promise of future action without the present intention to carry out the promise.

*Id.* at 592 (citations omitted).  To make a showing of promissory fraud within this framework, a plaintiff must demonstrate that "a promise or representation was made with the intent not to perform." *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978).  In outlining the type of evidence which must be demonstrated by the party asserting fraud, the Tennessee Supreme Court further observed that this burden could not be satisfied by plaintiff's "subjective belief," *see id.*, and quoted the *Restatement (Second) of Torts*, § 530, Comment (d) (1977), as follows:

The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into. The intention may be shown by any other evidence that sufficiently indicates its existence as, for example, the certainty that he would not be in funds to carry out his promise.

575 S.W.2d at 499 n.3.

17. Based upon a fully developed record, the court now concludes that CTF has failed to prove that Breed committed promissory fraud. More particularly, the court finds that CTF has failed to prove Breed intended to deceive it from the beginning, *i.e.*, that it made a promise without the present intention to carry it out. Here, the proof is overwhelming that Breed entered into this contract in good faith with the intention to use CTF for some of its hauling and shipping needs. More significantly, the proof indicates that the parties operated under this agreement without dispute from August 2001 through March 2003. In fact, Breed undertook an enormous amount of business with CTF. Under those circumstances, CTF would be hardpressed to prove that Breed did not intend to honor its commitment to CTF as set forth in the freight contract. Moreover, during that entire period of time, there is not one shred of evidence that CTF ever objected

that Breed was not spending enough nor that it was failing to receive the business which it bargained for.  What the proof does show, however, is that a group of investors acquired Breed on April 25, 2003, and that this new group of investors sought to improve Breed's financial performance following the purchase, including any that related to transportation services undertaken by CTF.  This situation was not one which could have been foreseen by Breed at the time it entered into the contract in July 2001.

18.     Moreover, the evidence introduced by CTF on this claim is very weak. CTF's evidence centers around Clayton's testimony that Faircloth indicated that CTF would receive its profit later in the agreement, after having repaid the $300,000.  Faircloth, however, denied making any such statement, and the court finds that Clayton's testimony is no more credible than Faircloth's testimony on this issue.  Thus, CTF has not carried its burden of proof on this issue with respect to this testimony.

19.     Assuming, *arguendo*, that Faircloth made such a statement, this statement, standing alone, does not allow CTF to carry its burden of proof on this issue.  In other words, even if the court credits Clayton's testimony that Faircloth predicted that CTF would make a profit in the latter period of the contract, this testimony does not establish that Breed knew that it would change carriers more

than two years later, a change which would result in drastic cost-cutting measures by the new owners.

*D. TCPA Violations*

20.	CTF next alleges that Breed violated certain provisions of the TCPA.  The TCPA grants a private right of action to consumers who suffer a loss due to "unfair or deceptive acts or practices" as defined in the Act.  Tenn. Code Ann. § 47-18-109.  The TCPA enumerates certain acts or practices which are considered deceptive, including "representing that a consumer transaction involves rights, remedies or obligations that it does not have or involve ... [.]"  *Id.* § 47-18-104(12). The TCPA also prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person."  *Id.* § 47-18-104(27).

21.	Plaintiffs who successfully press allegations of promissory fraud often have TCPA claims as well.  *See, e.g., Steed Realty v. Oveisi*, 823 S.W.2d 195, 201 (Tenn. Ct. App. 1991); *Brungard v. Caprice Records*, 608 S.W.2d 585, 589 (Tenn. Ct. App. 1980).  Furthermore, the Sixth Circuit has held that the TCPA does not require deceptive intent, which means a plaintiff may recover damages even for negligent violations. *Menuskin v. Williams*, 145 F.3d 755, 767-68 (6th Cir. 1998).

22.     In view of a fully developed record, the court concludes that CTF has failed to carry its burden of proof that Breed violated any provision of the TCPA.  Again, even if Faircloth made a statement that CTF could expect profits at the end of the agreement (a statement which he denies), the court cannot conclude that he was negligent by failing to foresee that Breed would be purchased in the future, that the new buyer would demand price reductions, which CTF would refuse, thereby resulting in Breed no longer using CTF for its hauling and shipping services. When this court previously denied Breed's motion for summary judgment on this issue, the court was concerned about the fact that Breed waited until after it received the $300,000 discount to cancel the freight hauling contract simply because CTF would not renegotiate when its profits would be maximized.  However, the proof does not support any claim of an unfair or deceptive act against CTF by Breed.

*E.  Lost Trailers*

23.     As detailed in this court's findings of fact, the bankruptcy court in Delaware issued an order, in effect, enjoining any actions against Breed that accrued before November 22, 2000.  For that reason, CTF is barred from making any claim for any trailers listed on Trial Exhibit 18 with a last known date of movement earlier than November 22, 2000.

24.	In so ruling, the court specifically rejects CTF's contention that its claim for these trailers is one of bailment and is therefore not encompassed by the bankruptcy court's order.  Rather, this court is of the opinion that the issue of these trailers is specifically one within the scope of the bankruptcy court's order.

25.	The proof indicates only one missing trailer with a date of last known movement after November 22, 2000 - Trailer No. 53087A on Trial Exhibit 18. Although the value set forth on that exhibit for that trailer is $16,000, the only supporting testimony regarding its value was Clayton's opinion that each trailer had an average value of $12,000.  The court finds that Clayton's testimony on this issue is credible and also notes that there is no testimony to the contrary.  Accordingly, judgment will be entered on this claim in the amount of $12,000.

*F. Claim for New Trucks*

26.	Finally, CTF claims that Breed knew that it was going to buy new trucks to service this freight contract.  CTF thus claims that this created some sort of obligation on behalf of Breed to pay for these trucks.

27.	At trial, both Boyer and Faircloth testified that they never did - and never would - approve of any vender's equipment purchase.  Furthermore,

Clayton admitted that he never sought approval from Breed before making this purchase;  instead testifying that he needed this equipment to service the contract.

28.     In view of this testimony, CTF has failed totally to carry its burden of proof that Breed is obligated to pay for these new trucks.  This conclusion is also supported by the fact that the freight contract itself is completely silent on this issue.

III.

### *Conclusion*

For the reasons foregoing, the Clerk is DIRECTED to enter judgment in favor of plaintiffs against Breed in the total amount of Twelve Thousand ($12,000.00) Dollars, with the costs of this matter to be taxed against Breed.[11]

**E N T E R :**

_____*s/ James H. Jarvis*_____
UNITED STATES DISTRICT JUDGE

---

[11]In ruling as it has, the court hereby respectfully OVERRULES Breed's motion for a judgment as a matter of law pursuant to Fed. R. Civ. P. 52(c), preferring instead to direct entry of a judgment on the fully developed record on all issues, including breach of contract.